JOHN N. SMITH v. THE YORK MANUFACTURING COMPANY (LIMITED).

1. A contract by which a boiler-maker agrees to deliver and set up boilers of a specified capacity, to be determined by a test made after the boilers are set up, is executory and may be rescinded by the purchaser if the test, when made, fails to show compliance with the contract.

2. This right to a rescission extends to an iron smoke-stack furnished under the same contract, which was part of the boiler plant placed on the same foundation and adapted especially for that kind of boilers, and not for other boilers, on account of the peculiar construction of the flues.

Rule to show cause certified from Monmouth Circuit.

This was an issue tried in the Monmouth Circuit. A jury was impaneled, but afterwards discharged, and, by consent, the issue was tried before the court. The finding of the court was in favor of the defendant. A rule to show cause why the said finding should not be set aside and a new trial granted was subsequently granted and certified into this court for an advisory opinion thereon.

The plaintiff's suit is for the contract price of two Kingsley boilers, of one hundred horse power each, and of an iron smoke-stack, furnished to the defendant.

Argued at June Term, 1895, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, VAN SYCKEL and LIPPINCOTT.

For the plaintiff, *Charles M. Stafford* and *Blair & Crouse*.

For the defendant, *Flavel McGee* and *David Harvey, Jr.*

The opinion of the court was delivered by

DEPUE, J. The plaintiff is a manufacturer of boilers known as the Kingsley drop-tube steam boilers. The defend-

ant had contracted with the Carroll Manufacturing Company to set up for that company a plant for manufacturing ice. For the purpose of fulfilling the contract with the Carroll company, the defendant contracted with the plaintiff to furnish and place in position two of the Kingsley boilers, with the fittings as described, set up complete for use and ready for the attachment of steam, feed, water and blow-off pipes. The boilers were delivered and set up on the 3d of June, 1891.

The boilers were furnished under a contract in writing. The negotiations were conducted by correspondence. The defendant, in letters dated January 26th and January 31st, asked that the result of the negotiations should be put in proper form of contract, specifying work, pressure, duty, material and price, to which letters the plaintiff replied, under date of February 2d, 1891, "We will send you contract by mail to-morrow or the day following."

Under date of February 3d, 1893, the plaintiff sent the following proposition, viz.:

"*York Manufacturing Co., York, Pa.:*

"Referring to your favors of 26th and 31st ult. and my letters to you of 29th ult. and second inst., I hereby propose to deliver two (2) Kingsley drop-tube steam boilers to you on the premises of the Carroll Manufacturing Co., in the city of Baltimore, Md., on March 15th, prox., of a capacity of 100 horse power each. [Here follows a specification of dimensions, materials, &c.] The capacity of said boilers is guaranteed to be as proposed, on the basis of the evaporation of 30 pounds water, from and at 212 degrees Fahrenheit per hour per horse power, on a fair and impartial test of not less than ten hours' duration, to which I or my representative shall be present.

"Payment for said boilers to be made by you as follows, viz.: 'Upon the completion of the setting up of said boilers, as before set forth, you shall pay to me the sum of twenty-seven hundred dollars ($2,700.00), and upon the completion

by me of a test showing the evaporative efficiency of said boilers to be 15 per cent. in excess of the evaporative efficiency of the average return tubular boiler, which said is eight pounds of water, from and at 212 degrees Fahrenheit, to a pound of good coal; then the balance of the price of said boilers, which is forty-one hundred and seventy ($4,170) dollars, less a special discount of 10 per cent., or ten hundred and fifty-three ($1,053) dollars, shall be paid.' If this is satisfactory to you, kindly send acceptance of this proposal by early mail, and oblige

"Yours very truly,
                              "JOHN N. SMITH."

To this proposition the defendant responded under date of February 6th: "Replying to yours of the 3d inst., we would state that we accept your proposition of that date, with the exception that we reserve the privilege of attempting to show a greater evaporative power than 8 ℔s. on return tubular boilers; we do not know that this will be forced upon us, but in case it should, wish to stand in a correct position, the proposition simply assumes 8 ℔s., and we accept the assumption with the foregoing reservation."

Under the date of February 9th the plaintiff answered: "Your favor of 6th inst. was duly received, and in reply have to say that your reservation in relation to the 8-℔. limit of a return tubular boiler is satisfactory to us, provided you are able to show us a test of one that will do better than that when the setting of our boilers is completed, as we do not desire to be held upon our final test to show the evaporative efficiency of our boilers."

The plaintiff's proposal of February 3d and the letters of February 6th and February 9th of the parties respectively, constituted the contract in writing.

The terms of the contract were these:

*First.* That the capacity of the boilers should be one hundred horse power each, on the basis of evaporation of thirty pounds of water from and at two hundred and twelve degrees

Fahrenheit per hour per horse power; *second*, that the boilers should show an evaporative efficiency fifteen per cent. in excess of the evaporative efficiency of the average return tubular boiler, which was estimated at eight pounds of water from and at two hundred and twelve degrees Fahrenheit to a pound of good coal; *third*, that the capacity and evaporative efficiency of the boilers should be determined by a test to be made as specified in the contract; and *fourth*, a reservation by the defendant of the privilege of showing a greater evaporative power than eight pounds on return tubular boilers. By the letters of the 6th and 9th of February, the parties also concluded a contract whereby the chimney stack for the boilers should be erected by the plaintiff.

The quality of the boilers, with respect to capacity and evaporative efficiency, was expressly stipulated for, and became an integral and substantive part of the contract, and the method provided for determining compliance with the contract was by means of a test to be conducted as designated in the contract. The defendant's agreement to purchase and pay was upon those conditions; and if, upon such a test, the boilers did not comply with the terms of the contract, it had a right to rescind and annul the contract. *Bannermann* v. *White*, 10 *C. B.* (*N. S.*) 844; *Behn* v. *Burness*, 3 *Best & S.* 751; 6 *Eng. Rul. Cas.* 492; *Wolcott* v. *Mount*, 7 *Vroom* 262. The distinction between a warranty, which will simply lay the foundation for an action for damages, and a condition, which will also justify rescission, is clearly stated in *Clark Cont., pp.* 313, 314.

The boilers were set up and fire put under them June 3d. Within two weeks Mr. St. Clair, the defendant's general manager, made the objection that they could not get two hundred horse power out of them. Changes were then made in the stack, which were completed on Saturday, July 11th. On Monday following, the work was inspected by the representatives of the defendant and the officers of the Carroll Manufacturing Company, and Mr. St. Clair demanded a test of the boilers, and the following Wednesday (July 15th) was

named as the time for making the test. Mr. William T. Howard, an engineer, was agreed upon to make the test. He was selected by Mr. Purington, the plaintiff's representative, and approved by Mr. St. Clair. On the Wednesday named the test was made by Howard, in the presence of Purington, St. Clair and the plaintiff.

The test was finished July 16th. Howard made his report in writing, dated July 18th, and sent it in duplicate to the plaintiff, who, on the 21st, transmitted a copy to the defendant, with a note, as follows: "With this we enclose copy of the boiler test, the receipt of which please acknowledge. If we had not lost half an hour at starting the first fire, we could have given you about 210 horse power, but it can't be helped now." Howard's report showed that, in evaporative efficiency, the boilers fulfilled the contract, but he certified their capacity in these words: "Horse-power basis of 30 pounds of water evaporated per hour, at 212 degrees to steam, at 70 pounds pressure, 198.5," which was less than the horse power contracted for. The criterion agreed upon by the parties for determining whether the contract was fulfilled, could not be applied until the boilers were set up and in condition to be subjected to the test; and until the test was made, the contract was executory and subject to be rescinded by the defendant if the test failed to show compliance with the terms of the contract.

St. Clair testified that when Howard's report was received he examined it, and went over some of the calculations to satisfy himself that the calculations were correct, and finding that Howard's report showed that the horse power was short in its capacity, on July 25th he wrote to the plaintiff as follows: "Replying to your favor and acknowledging the receipt of the papers of test made of boilers, we respectfully state that, inasmuch that you have failed to fill contract, notwithstanding the extraordinary means used and the long time occupied by you in your various experiments to that end, we would demand the immediate removal of said boilers, that we may replace same with others at once. We also notify you

that we hold you responsible for all damage that we may have or will sustain from this failure on your part to fill contract, until we can substitute boiler plant with others."

This letter was a rescission of the contract made within a reasonable time. The correspondence—the plaintiff's letter of the 21st and the defendant's reply of the 25th—is important as showing that the plaintiff adopted Howard's report, and that upon that report the defendant made rescission. Howard's report of the amount of horse power justified rescission, and in a short time, within three or four weeks, the defendant removed the boilers and stack, replacing the boilers with tubular boilers. Unless Howard's report can be set aside, or its adoption by the plaintiff avoided, the defendant was justified in rescinding and annulling the contract, and the defence is complete.

The test was continued for ten hours, and the manner in which it was conducted was at the time satisfactory to both parties. Howard's report states the quantity of coal used, the pounds of water evaporated per hour, the mean temperature of the feed-water and the mean pressure of steam. The mean pressure of steam actually applied was one hundred and five and ninety-five hundredths pounds to the square inch, and the mean temperature of the feed was two hundred and thirty degrees. The figures exhibited by the test as made were taken down by Purington and St. Clair, and as reported by Howard, are practically undisputed. The capacity of the boilers in horse power remained to be computed on the basis of the figures obtained by the tests. Howard reported the horse power at one hundred and ninety-eight and five-tenths, on the basis of thirty pounds of water evaporated per hour, at two hundred and twelve degrees, to steam at seventy pounds pressure, and it is conceded that, on the basis of his calculation—seventy pounds pressure—his result in horse power was correct.

The contract fixes the mode in which the capacity of the boilers was to be ascertained—by a test. The results disclosed at the test, the quantity of coal used, amount of water evapo-

rated, &c., are conclusive upon the parties if the test was properly conducted. If either party was dissatisfied with the conduct of the test, the remedy was by requiring another test, until a fair and impartial test was obtained. But Howard, although selected by the parties to make the test, was not, by the contract, constituted an umpire to pass judgment and decide upon the capacity of the boilers, and his computation of the horse power would not be conclusive unless conclusiveness was given to it by the agreement or conduct and acts of the plaintiff.

To overcome the effect of Howard's report of the horse power, the plaintiff produced the testimony of experts, who testified that the scientific and proper mode of calculating horse power, where the contract specifies an evaporation "at and from 212 degrees," as this contract does, is to make the computation at two hundred and twelve degrees, at atmospheric pressure of fifteen pounds, and that upon the figures given by Howard, and a computation upon that basis, the capacity of the boilers would appear to be two hundred and five horse power. The difference between a computation of horse power under a pressure of seventy pounds, and the same computation at atmospheric pressure, is that to obtain a given horse power at seventy pounds pressure, more heat and consequently more coal would be required than at atmospheric pressure. In other words, on the standard of an evaporation of thirty pounds of water at two hundred and twelve degrees, a computation of horse power upon a given amount of coal and an ascertained quantity of water evaporated, would give less horse power if computed at seventy pounds pressure than it would on a computation simply at atmospheric pressure. The plaintiff's experts admit that Howard's computation of horse power is correct upon the rule he adopted. They dispute his right to apply that rule in the computation.

The computation of horse power on the basis of atmospheric pressure is in accordance with a formula approved by the Franklin Institute. It seems to be the method usually adopted. But it appears by the testimony of Professor

Jacobus that there is more than one standard used by scientists; that there is no standard of boiler horse power universally accepted by engineers, and that in computing horse power some standard must be taken which is agreed upon by the parties. The professor's condemnation of the standard applied by Howard is based upon a construction of the original contract. Professor Jacobus also testified that another society—the American Society of Mechanical Engineers, comprising a membership of one thousand eight hundred practical engineers—in 1885 recommended the use of the standard based upon seventy pounds pressure, but that two hundred and twelve degrees feed-water were not the figures this society mentioned. He adds that, in consequence of the recommendation of the American society, he puts in two units of horse power in all boiler tests he makes. The contract is silent as to the rule by which the horse power is to be computed, and it appears that such a computation is capable of being made on the basis of two hundred and twelve degrees, at a pressure of seventy pounds, as well as at atmospheric pressure. Howard's computation was made on that basis. Professor Jacobus testified that Howard computed the horse power on the assumption of feed-water at two hundred and twelve degrees and evaporation into steam under seventy pounds pressure.

It appears that the standard recommended by the American society may be applied in the computation of boiler power, and that it should be applied if such be the agreement of parties. St. Clair testified that when the test was applied for and conceded, Mr. Gladfelter (the president of the defendant company) asked how the test was to be conducted, and said that he was ignorant of such matters and would like to know; that Mr. Purington stated that it would be made upon the basis of thirty pounds of water evaporated per hour from two hundred and twelve degrees, at seventy pounds steam pressure. Mr. Gladfelter asked why he selected seventy pounds steam pressure. Mr. Purington stated that it was an established rule of the American Society of Mechan-

ical Engineers, and that he (the witness) and Mr. Gladfelter maintained that it should be the working pressure of the boilers; and that that terminated the conversation. This contention of Purington with respect to the basis on which the test should be conducted, agrees in substance with Howard's report — feed-water two hundred and twelve degrees and seventy pounds pressure. The witness further testified that the next evening, just previous to the commencement of the test, the subject was resumed in the presence of the plaintiff, Howard, the two engineers and the fireman. He testified that some conversation as to the temperature of the feed-water, in which two hundred and thirty degrees, as reported by Howard, was agreed upon, brought about a discussion as to the pressure under which the boilers were to be run. Mr. Purington had requested that the safety valves be set at seventy pounds pressure; that the witness requested that they be set at a higher pressure, that the machines might be operated during the test; that they agreed to that, Mr. Howard saying that he would make an allowance for the difference in the mean to the seventy pounds; that the witness asked why they were not entitled to the mean working pressure, and Mr. Purington repeated his previous statement that it was the rule of the American society, and Mr. Howard corroborating that statement, he (St. Clair) submitted to the seventy pounds pressure. Mr. Purington testified that it was not agreed that the test should be conducted on the basis of seventy pounds pressure. Seitz, the fireman, confirmed St. Clair's testimony, which is strengthened notably by the fact that Howard reported the horse power as computed under the pressure of seventy pounds. Howard was not called as a witness to explain why he inserted the statement in his report that his computation was on that basis. St. Clair's testimony on this head is confirmed still more notably by the fact that Howard's report was received by the plaintiff and sent to the defendant for action thereon without demur. St. Clair testified that the first knowledge he had of the plaintiff's purpose to repudiate Howard's report in any respect was when testi-

mony to that effect was introduced at the trial, and he is not contradicted on that subject by anyone. The clear weight of the evidence is that there was an arrangement between the parties that the test was to be made of horse power rated at the pressure of seventy pounds. Purington was more than an agent with limited powers; he was secretary of the Kingsley Boiler Company, the owners of the patent. The plaintiff was manufacturing the boilers in connection with the owners of the patent, and in these transactions Purington represented the owners of the patent and the plaintiff. The entire correspondence with the defendant was conducted by him, and the conduct of the test in every particular was entrusted to him. His acts and conduct in the premises are binding upon the persons whom he represented. Writing in the name of the plaintiff, under date of August 12th, Purington says " that, having fulfilled our contract with you to furnish 2 100 H. P. boilers, capable of evaporating 15 per cent. more water to 1 ℔. coal than the average return tubular boiler, and as you have furnished no evidence that the test made at the Carroll Manufg. Co. works July 16th ult. was not a sufficient proof, we do absolutely and positively refuse to remove the boilers or have anything further to do with them *unless* you can give evidence that their economy is below our guarantee, then we will give another test, based upon economy alone, which will show that evaporative efficiency."

This letter is an evasion of the real matter in controversy. Purington knew, from correspondence and conversations before and after the test, that the defendant's complaint was that the boilers did not show two hundred horse power. He knew that the economy test, on the basis of evaporation, as compared with the assumed evaporative efficiency of tubular boilers, was reserved to the defendants, to be resorted to in the event of the test that was had showing that the plaintiff had complied with the conditions expressed in the plaintiff's proposal. He also knew the exigency for speedy action arising from the defendant's contract with the Carroll company. In response to the plaintiff's letter of August 12th, the de-

fendant, in a letter of the date of August 15th, reiterated the demand for the immediate removal of the boilers, for that they were not up to contract in the horse power required, and it was not until August 20th that the plaintiff signified his willingness to submit the boilers to another test.

The plaintiff's letter of August 12th was an emphatic and positive refusal to consider the real matter in dispute, and warranted the defendant in treating the rescission as completely accomplished. The boilers and stack were then taken down and removed. The plaintiff's communication of August 20th, offering another test, came too late. When this letter was received by the defendant the boilers were being removed and other boilers to take their places were ordered. Howard's report, containing a computation of the horse power having been accepted and adopted by the plaintiff and sent by him to the defendant, and having been acted upon by the defendant, we think that after the refusal of the plaintiff to consider the defendant's protests against the boilers as not conforming in horse power to the requirement of the contract, the defendant, if the first test was not satisfactory to the plaintiff, was not required to delay longer when delay would seriously interfere with the completion of its contract with the Carroll company.

The contract between the parties, consisting of the plaintiff's proposition of February 3d and the letters of the parties respectively of February 6th and February 9th, was one entire contract for furnishing the boilers and the chimney stack. The stack was part of the boiler plant, placed on the same foundation and brickwork, and was adapted especially for that kind of boilers, and not for other boilers, on account of the peculiar construction of the flues. It was of iron, and was taken down and laid aside when the boilers were removed. Where there is a right of rescission with respect to the principal subject of an entire contract, the power to rescind extends to the appendages attached to the principal.

The finding of the trial court is sustained by the evidence, and the rule to show cause should be discharged.